*State of Maryland v. Kyeem Antonio King*, No. 42, September Term, 2025.  Opinion by
Killough, J.

**CRIMINAL LAW – WAIVER – ABRUQUAH CLAIM**

The Supreme Court of Maryland held that the rule announced in *Abruquah v. State*, 483
Md. 637 (2023), which barred unqualified firearms  identification testimony on the record
presented in that case, was a case-specific determination and not a categorical rule.  Here,
Respondent waived his challenge to the reliability of the firearms  identification
methodology.  Even had his challenge been merely unpreserved, as opposed to waived, the
Supreme Court of Maryland held that admission of the unqualified firearms  identification
testimony was not plain error.

Circuit Court for Prince George's County
Case No.: CT191113X
Argued: April 7, 2026

IN THE SUPREME COURT

OF MARYLAND

———————————————————————

No. 42

September Term, 2025

———————————————————————

STATE OF MARYLAND

v.

KYEEM ANTONIO KING

———————————————————————

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

———————————————————————

Opinion by Killough, J.

———————————————————————

Filed: July 27, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I.

This appeal is a companion to *State v. Thornton & Dunbar*, No. 46, Sept. Term 2025, which we decided earlier this term. Both cases concern the admissibility of unqualified firearms identification testimony following our decision in *Abruquah v. State*, 483 Md. 637 (2023). As we held in *Thornton*, *Abruquah* did not announce a per se rule barring such testimony. It was a case-specific determination under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Rochkind v. Stevenson*, 471 Md. 1 (2020), tied to the evidentiary record developed at the hearing in that case. *State v. Thornton*, No. 46, Sept. Term, 2025, 2026 WL 1846743, at *8 (Md. June 26, 2026). A defendant who wishes to challenge the reliability of the State's firearms identification evidence must do so through a proper pretrial motion under Maryland Rule 4-252. *Id.* at *11. We agree with the State that, because *Abruquah* established no categorical prohibition, the admission of such testimony was not clear or obvious error, and the claim does not qualify for plain error review.

This case presents the principle in an even starker posture than in *Thornton*. There, the defendants failed to challenge the firearms expert's methodology or to otherwise object to his trial testimony linking the firearms to the recovered ballistics evidence. Here, the Defense did more than fail to object. It affirmatively told the trial court that its concern was "not with the science." On this record, Respondent's claim fails for two additional and independent reasons. *First*, the Defense waived any challenge to the reliability of the firearms methodology by disclaiming it on the record. *Second*, the claim was preserved and so was subject to plain error review, which it could not meet

This appeal began before the Appellate Court of Maryland, where Respondent Kyeem Antonio King challenged his convictions in the Circuit Court for Prince George's County for the second-degree murders of Davion Brandon and Antonio Taitano-Walker. At trial, the State presented testimony from a firearms identification expert who offered an unqualified opinion that bullets and cartridges recovered from the crime scene were "fired from" or "identified to" a semi-automatic handgun linked to King. Although the Defense raised discovery objections regarding the expert's bench notes and initially signaled an intent to challenge the reliability of the ballistics science, it failed to file a motion for a *Daubert-Rochkind* hearing or otherwise object to the examiner's ultimate conclusions.

While King's appeal was pending, this Court decided *Abruquah v. State*, 483 Md. 637 (2023), holding that the prevailing ballistics methodology as presented in the *Daubert-Rochkind* hearing held in that case cannot support an unqualified opinion that ammunition evidence was fired from a specific firearm. King raised an *Abruquah* claim for the first time in his reply brief to the Appellate Court. In the alternative, King argued that the circuit court committed plain error under *Abruquah* in admitting the unqualified firearms testimony. The Appellate Court reversed King's conviction, reasoning that "[b]ecause the firearms conclusion in this case matched the testimony held to be improper in *Abruquah*, the trial court abused its discretion in admitting the testimony." *King v. State*, No. 1779, Sept. Term, 2022, 2025 WL 1720003, at *8 (Md. App. Ct. June 20, 2025). The State appealed the reversal to this Court.

We granted certiorari to answer the following question:

2

Did the Appellate Court err by holding that *Abruquah v. State*, 483 Md. 637 (2023), required firearm identification to be excluded when the trial occurred before *Abruquah*, the issue was not preserved for appellate review, and the State, as the proponent, had no opportunity to litigate the evidence's reliability in a *Daubert-Rochkind* hearing?

For the reasons detailed below, we hold that the Defense waived any challenge to the reliability of the firearms identification methodology and that even if the challenge was not waived, it does not satisfy plain error review. Accordingly, we reverse the judgment of the Appellate Court.

## II.

## FACTS

### A. The Crime and Subsequent Investigation

On the morning of June 1, 2019, police officers observed a grey Honda Accord in the middle of a parking lot with its headlights on and rear doors open. Upon closer investigation, police found two gunshot victims, Davion Brandon and Antonio Taitano-Walker, in the front seats of the car. Medical forensic evidence confirmed the cause of death of both victims as multiple gunshot wounds. Brandon sustained twelve gunshot wounds, most of which were shot from behind. Some of the bullet wounds Brandon sustained showed signs of stippling, implying that the bullets were fired at close range. Taitano-Walker sustained five gunshot wounds to the back and had $2,500.00 in cash on his person.

Near the Accord, police found a black Glock 19 Gen5 9mm semi-automatic handgun. Though there were no fingerprints recovered from the gun, it contained 9mm

3

Blazer headstamp cartridges in the magazine. Thirteen spent cartridges of the same kind and several fired bullets were found around the Accord and in the bodies of the victims.

Police also recovered Respondent's cellphone in the backseat of the Accord. The phone contained a picture of a black Glock 19 Gen5 9mm, and it appeared to depict the same gun as the one found at the crime scene. A few days before the shooting, Respondent had sent this picture to Taitano-Walker along with a text mentioning a debt the victim owed King.

Surveillance footage from a nearby tobacco store showed both victims in Taitano-Walker's car. The footage also showed Respondent and two other individuals in the backseat of the car. During an investigative interview about two weeks after the shooting, King admitted he was in the back of the car when the shooting occurred and that he left his phone there but said that one of the other individuals in the car shot the victims. However, police later elicited testimony from a rideshare driver that contradicted respondent's narrative. The rideshare driver stated that the person whom King accused of shooting the victims was in a nearby rideshare vehicle when the shooting occurred.

On October 24, 2019, a Prince George's County grand jury indicted King on two counts of murder in the second degree, two counts of use of a firearms in a violent crime, one count of carrying a handgun in a vehicle, and one count of carrying a loaded handgun in a vehicle.

**B.     Pre-Trial Discovery and the Lack of a Pre-Trial *Daubert* Hearing**

King's initial trial date was set for July 27, 2021, but was continued until April 25, 2022. Discovery ensued in the year leading up to the initial trial date. On February 5,

4

2020, the State provided the Defense notice of its plan to call Jamie Smith as an expert in the area of forensic firearms and toolmark examination and its intention to have Mr. Smith testify on "all aspects of forensic firearms and toolmark examination including functional testing, bullet and casing comparison and pairing, chemical testing and microscopic examinations, gunshot residue analysis . . . , trigger pull ejection patterns, shot patterns serial number restoration (and any pertinent toolmark examination)." The State also produced the firearms examination expert report "months" prior to July 2021. The expert report on which Mr. Smith intended to base his testimony clearly described the bullets recovered from the crime scene and the bodies of the victims as "having been fired" from the black Glock found at the crime scene. It also "identified" the fired cartridge cases police recovered to the same gun.

Numerous exchanges took place between the State and the Defense during the discovery period. Notably, on July 8, 2021, the Defense filed a Motion to Compel Discovery and Motion for Sanctions, requesting "complete expert disclosure, in compliance with the rules of evidence, including expert witness contact information, source documents and CVs." The State produced the CV for Smith, the firearms examiner, as well as that of the DNA examiner on July 13, 2021. In the course of the same exchange, the State directly asked the Defense the following clarification question: "Are you requesting the bench notes for the DNA and FEU [Firearms Examination Unit] examination?" The Defense responded, "While we would like to have the supporting documentation for the DNA, what we were most interested in was the supporting

5

documentation about the phone records." The Defense did not mention the bench notes for the firearms examination in its response to the State's question.

On July 16, 2021, the State sought to continue the July 27, 2021, trial date. The Defense filed an Opposition to Continuance and Motion to Dismiss for Discovery and Speedy Trial Violations in which it requested "DNA source documents and bench notes." On July 21, 2021, the circuit court continued the case and set a date for a status update regarding all discovery requests. On September 18, 2021, the parties appeared before the circuit court for a status conference, and the hearing sheet from that conference indicated that discovery was "essentially completed."

On April 21, 2022, four days before the trial, the Defense requested to exclude the firearms examiner's testimony. The Defense contended that there were outstanding discovery issues with respect to the State's various expert witnesses, including the firearms examiner, Mr. Smith. The Defense specifically asked for missing bench notes[1] and source documents for the State's firearms expert. The Defense argued that, even if the bench notes were produced that same day, King would suffer "great" prejudice, because, given the impending trial, it would provide the Defense little time to prepare their own counter expert witness. As such, in the Defense's view, exclusion of the State's firearms expert witness was "the better and more appropriate remedy." In the alternative, the Defense requested "the immediate disclosure" of the missing bench notes.

---

[1] Bench notes are a laboratory analyst's recorded notes.

6

In response, the State pointed out the many opportunities the Defense had to request the firearms examiner's bench notes by name, including the July 13, 2021, exchange where the State explicitly asked the Defense whether they were "requesting the bench notes for the DNA and FEU examination[.]" The circuit court remarked upon how the Defense was willing to go to trial without these bench notes back in July 2021 before the trial was continued, a continuance the Defense opposed. Nonetheless, the circuit court found that the State had committed an unintentional discovery violation and ordered the State to produce the bench notes. The court, however, denied the Defense's request to exclude the firearms expert's testimony.

## C. The Trial and the Lack of a *Daubert* Motion

On April 25, 2022, the first day of trial, the Defense renewed its motion to exclude the firearms expert testimony. In doing so, Defense counsel provided the following reason:

> [DEFENSE]: We've received the bench notes . . . And we reviewed them with the standard operating procedures of the Firearms Examination Unit of Prince George's County Police Department. And so we found with our forensic's [sic] department several inconsistencies between the standard operating procedures and the actual procedures that were applied in this case, and based on that, we believe that we have a *Daubert* challenge that we would not have known about without the bench notes because it wasn't revealed until we looked at the supporting documentation . . . [Also,] [c]urrently there are two cases on remand from the appellate court . . . that found that it was reversible error that the Defense was not allowed to have a *Daubert* hearing as to firearms examination in particular — and those cases are . . . — *Abruquah v. State*, 471 Md. 249; and *William v. State*, 251 Md. App. 523 . . . There are questions as to the reliability of firearms examination in general, and as applied in this case based on the way in which the examiner conducted his investigation or his examination.

In response, the circuit court asked whether the Defense "was able to do a *Daubert* hearing" or if they were "asking for a continuance." Though the Defense admitted that a *Daubert* hearing is "absolutely necessary" and pointed out that foregoing a *Daubert* hearing would violate Respondent's confrontation rights, they implied that they were not able to challenge the firearms examiner testimony until the eve of the trial, because they did not receive the bench notes in a timely manner. The Defense further argued that a continuance would violate Respondent's speedy trial rights. Thus, the Defense asserted, "the appropriate remedy is the exclusion of the evidence" without a *Daubert* hearing or a continuance.

When the circuit court asked why the Defense failed to ask for a continuance on the day it received the bench notes, the Defense responded as follows:

> [DEFENSE]: [We] put it to [the circuit court] exactly as I put it . . . just now, that we believe the appropriate remedy was an exclusion, but . . . we didn't say we didn't want a continuance or anything like that . . . and so as a middle ground, [the circuit court] said send [the Defense] the [bench notes] . . . . However, there were as-applied issues that we did discover. . . . So the standard operating procedures require that the firearms examiner take multiple test fires and then compare those test fires to one another to see what the individual characteristics will be between the test-fired casings, and the found casings that are part of evidence, and then to compare the consistent, individual characteristics between the test-fired casings and then turn around and compare them to the found evidentiary casings. Here that was not done. . . . So for that reason, not only do, of course, we have issues with the field of firearms examination in general as applied in this case, we don't believe that the expert followed that, and so we would need to consult with our own expert . . . because we don't know what our expert would say, but if they came to the conclusion that these procedures were not followed appropriately or that the opinion is not reliable and should not be

8

credited, then we would need to call them as a witness. And we're foreclosed from doing that at this point in time.

When the trial court asked why the Defense did not have a counter firearms expert witness prepared to testify on behalf of Respondent, the Defense explained:

> [DEFENSE]: [T]he issues that arose with the firearms examiner report were not revealed until we got the bench notes. On the face of the report itself, it doesn't reveal any of these issues. It's only when you see the bench notes and you see kind of where the examiner is showing his work in how he reached these conclusions and then comparing it to the standard operating procedures, that we knew that he did not follow the standard operating procedures. And it's the as-applied issues in this case that we would be challenging. Before that there was no way for us to know we did make the request.

The Defense reiterated its inability to secure an expert witness on such a tight timeline, prompting a clarifying question from the bench regarding the true basis of the motion to exclude:

> [THE COURT]: So your issue is not with the science, it's with the person [who] didn't follow the procedures.
>
> [DEFENSE]: Yes. The importance of that, however, could be best be flushed out by an expert and then — it's more than that, though, Your Honor. There is the as-applied issue in this case, which we can attempt to make, you know, a cross-examination based on learning an area of science over the weekend with the as-applied issue. There's also a general issue, my understanding from this study, called PCAST, which called into question the reliability of firearms examination as a practice in general.

The circuit court then inquired into why the Defense was unable to bring in forensic unit attorneys to cross-examine the State's firearms witness. The Defense reiterated the time constraints:

> [DEFENSE]: So my understanding is . . . [the forensic unit attorneys] consult with an expert in order to prepare for cross-examination. They

9

have not retained or consulted with an expert in this case for cross-examination. And then there's also the right to the *Daubert* hearing . . . so *Daubert* has two prongs. There is the field of study that you can challenge, but there is also the as-applied issues, and in order to challenge the State's expert, the Defense would need an expert in order to testify at the *Daubert*, . . . and the right to consult with that expert, not just the cross-examination of that expert at the *Daubert* hearing. So there is the cross-examination at trial in front of the jury, and then there is the pretrial issue of admissibility and reliability under *Daubert*, which we have not been able to address because we did not have the bench notes. Without the bench notes we could not have at least challenged the issues on the — the as-applied issues in the *Daubert* context. And as I said before, the Courts are finding that that's an issue where it is requested. We will file a request for a *Daubert* hearing at this point in time for Mr. King, however . . . we would not be prepared to proceed on one based on the fact that we have [not] consulted with an expert because we received the discovery on Friday afternoon.

Despite their statement to the court, the Defense never filed a request for a *Daubert* hearing. The court ultimately denied the Defense's motion in limine to exclude the State's firearms examiner testimony and explicitly found that "the field is not at issue" but rather "the issue [the] Defense says is as-applied." It found that the Defense was "capable of impeaching the witness with regard to . . . failing to follow the standard operating procedures, and that can go to the weight of the evidence for the jury." Following the ruling, the Defense reiterated its intention to file a *Daubert* motion:

[DEFENSE]: Okay. Your Honor . . . for the record, the Defense either has filed today or will be filing today . . . a motion in limine to exclude firearms identification evidence as unreliable [under] *Rochkind*, which is the *Daubert* status, to the as-applied issues, as well as to the general issues. I will provide courtesy copies to the Court.

The Defense never filed a *Daubert* motion. On April 27, 2022, the day the State's firearms examiner took the stand, the Defense noted its objection once more:

10

[DEFENSE]: So for Mr. Smith, the Defense had previously made an objection as to his use of the firearms examiner and stated our intention for a *Daubert* hearing because we had received the discovery untimely, and since we could not because of time restraints, we're just renewing the objection for the record, Your Honor. And we incorporate all previous arguments.

[THE COURT]: There's been no change in circumstances. The motion is denied.

The State's firearms expert witness testified that "the 13 fired 9mm cartridge cases were identified as having been fired in the GLOCK semi-automatic pistol submitted." He also "identified" eight of the fired bullets that were submitted as "having been fired in the submitted GLOCK pistol." The Defense did not make a contemporaneous objection to this testimony.

In addition to the firearms expert witness, the State also presented to the jury testimony from Samuel Sullivan, whom King met while they were both detained at the Prince George's County Detention Center. Sullivan testified that Respondent bragged to him about shooting the victims and taking a large amount of cash. Sullivan also recounted details about the shooting that King allegedly shared with him, including that King shot the victims from the backseat of a Honda Accord using a Glock 19 9mm firearms and that Respondent left his cellphone in the backseat of the Accord when attempting to flee the scene.

The trial concluded on April 29, 2022. On May 4, 2022, King was convicted of two counts of second-degree murder, two counts of use of a firearm in a crime of violence, transporting a handgun in a vehicle, illegal possession of a regulated firearm, and wearing, carrying, and transporting a handgun. King was subsequently sentenced to two consecutive

11

sentences of 40 years, suspending all but 35 years, for the second-degree murder convictions. Including the lesser concurrent or merged sentences he received, King was sentenced to an aggregate 125 years with all but 95 suspended. On October 5, 2022, King timely appealed his conviction.

### D.     Appellate Proceedings

King initially based his appeal on seven claims of error. In the time between when King filed his opening brief and his reply brief in the Appellate Court, this Court decided *Abruquah v. State*, 483 Md. 637 (2023). We held that the AFTE [Association of Firearm and Tool Mark Examiners] theory of firearms identification could support an opinion that ammunition evidence was "consistent with" having been fired from a particular firearm but could not support an unqualified opinion that the ammunition was fired from the specific firearm. *Abruquah*, 483 Md. at 694-95. We, however, expressly limited our holding in *Abruquah* to the record before us in that case. *Id.* at 696. Relying on this decision, King advanced a new *Abruquah* claim in his reply brief. At oral argument, the State argued that King failed to raise a challenge to the reliability of firearms identification in the circuit court and thereby waived the claim.

In an unreported opinion, the Appellate Court ruled for King. *King*, 2025 WL 1720003, at *8. It noted that, while "[b]ad faith or a willful violation of discovery by the State can justify the exclusion of evidence[,]" there was "no bad faith on the part of the State" that would merit exclusion of the firearms expert testimony here. *Id.* at *6. Moreover, the intermediate appellate court acknowledged the State's preservation argument with respect to the *Abruquah* claim and King's repeated statement in front of the

12

circuit court regarding its inability to prepare for a *Daubert* hearing in the given timeline, but it ultimately decided the *Abruquah* issue in favor of King. *Id.* at *5, 7.

The Appellate Court held that the trial court "properly denied the request . . . for a Daubert hearing" at the time it made the admissibility determination but concluded that this Court's intervening decision in *Abruquah* had changed the analysis. *Id.* at *7-8. Thus, given that the firearms expert's testimony "was a similar unqualified conclusion to what was held to be improper in *Abruquah*[,]" the Appellate Court concluded that "the trial court abused its discretion in admitting the testimony." *Id.* at *8. It then went on to find that this error was not harmless, because, not unlike *Abruquah* where the firearms expert "was the only direct evidence before the jury linking Mr. Abruquah's gun to the crime[,]" *id.* (internal citations and quotation marks omitted), "[s]imilarly here, there was only circumstantial evidence connecting [King] to the shooting[,]" *Id.* Having found that the trial court abused its discretion in admitting the State's firearms expert testimony and that this error was not harmless, the Appellate Court reversed and remanded King's case for a new trial. *Id.*

## III.

## STANDARD OF REVIEW

A threshold question in this case is which standard of review applies, a determination that turns entirely on whether King preserved his challenge to the firearms identification testimony. When a defendant preserves a challenge to the admissibility of evidence by raising it in the trial court, an appellate court reviews the trial court's ruling for an abuse of discretion. *State v. Robertson*, 463 Md. 342, 351 (2019). We review any

13

resulting error for harmlessness, asking whether the State has shown beyond a reasonable doubt that the error did not influence the verdict. *Dorsey v. State*, 276 Md. 638, 659 (1976). The defendant bears the burden of showing an abuse of discretion. If the defendant carries that burden, the State bears the burden of proving harmless error.

When a defendant fails to preserve a challenge, the analysis changes. Ordinarily, an unpreserved claim is reviewable, if at all, only for plain error. *Rubin v. State*, 325 Md. 552, 587 (1992) (internal citations and quotation marks omitted); Maryland Rule 8-131(a). Before an appellate court may exercise its discretion to reverse a conviction on the basis of plain error, four conditions must be satisfied: (1) there was an error or defect that has not been intentionally relinquished or abandoned; (2) the legal error was clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which ordinarily means it affected the outcome of the proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Beckwitt v. State*, 477 Md. 398, 464 (2022). Under that standard, the burden rests with the defendant. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

As we explain below, King's challenge to the firearms expert's testimony fails at the first prong of the harmless error analysis because it was not merely unpreserved; it was waived. As we will explain, it fails at other prongs as well. Whether a litigant has preserved a claim, and the related question of whether a litigant has complied with the requirements of Maryland Rule 4-252, are questions of law that we review without deference. *See Cole v. State*, 378 Md. 42, 56 (2003).

14

**ANALYSIS**

**A.     The Respondent Waived Any Challenge to the Reliability of the Firearms Methodology**

Waiver is the intentional relinquishment or abandonment of a known right.  *State v. Rich*, 415 Md. 567, 580 (2010).  In *Abruquah*, we held that the record before us "weighs against admission of testimony of a 'match' between a particular firearm and a particular crime scene bullet" and vacated Abruquah's conviction.  483 Md. at 691.  Here, King waived a similar *Abruquah* claim when he affirmatively limited the basis of his objection to the State's firearms  expert testimony to an "as-applied" issue, failed to file a timely *Daubert* motion under Maryland Rule 4-252, and opposed a *Daubert* hearing on the record.

*1.     Respondent affirmatively waived any potential* Abruquah *claim.*

The record shows that King affirmatively waived his objection to the reliability of the firearms expert's testimony.  Waiver is the intentional relinquishment or abandonment of a known right.  *Rich*, 415 Md. at 580.  On multiple occasions, King repeatedly stated that his objection to the State's firearms  expert testimony was based on an "as-applied" challenge.

Soon after receiving the firearms  examiner's bench notes, the Defense renewed its motion to exclude the State's firearms  expert testimony based on having found "several inconsistencies between the standard operating procedures and the actual procedures that were applied in this case."  The Defense then reiterated that the bench notes revealed "as-applied issues," which stemmed from the firearms  examiner not having followed "the

15

standard operating procedures." Later in the same exchange, when the trial court asked why the Defense did not have their own expert testimony prepared, the Defense restated for the third time that "it's the as-applied issues in this case that [they] would be challenging." And, though these issues were not apparent "on the face of the [expert] report itself," the Defense stated that they discovered them when they saw the bench notes and were able to "compar[e]" the examiner's "work in how he reached [his] conclusions . . . to the standard operating procedures." Finally, when the circuit court stated, "So your issue is not with the science, it's with the person [that] didn't follow the procedures[,]" the Defense responded, "Yes." These statements, taken together, amount to an intentional relinquishment of any challenge King could raise against the reliability of firearms and toolmark identification science.

Relying on this record, the circuit court appropriately found that the issue "is as-applied." We review a trial court's findings of fact for clear error. *Hailes v. State*, 442 Md. 488, 499 (2015). Here, time and time again, King explicitly based his objection to the State's firearms examiner on an "as-applied" challenge. When the court declared that King's issue was "not with the science" but rather "with the person [that] didn't follow the procedures," the Defense responded in the affirmative. Based on these assertions, the trial court reasonably found that "the field is not at issue." This factual finding is supported by the record, and we must honor it.

Additionally, none of the other arguments King made preserve the *Abruquah* issue. In bringing the "as-applied" challenge to the court's attention, King mentioned the existence of studies "which called into question the reliability of firearms examination as

a practice." The Defense also noted that, if they had more time to consult their own expert and "*if* [this expert] came to the conclusion that . . . the [State's expert] opinion is not reliable and should not be credited," they would have called them to serve as a counter witness. (emphasis added). Neither point saves King's case. Hypothetical musings about a party's potential plans to litigate an issue do not preserve that issue. They fail to provide concrete notice to the court and to the opposing party that a given claim is indeed being contested.

This reasoning holds added weight where, as here, King had access to the firearms examiner's expert report "months prior" to the initial July 2021 trial date, and the report explicitly described the bullets recovered from the crime scene and the bodies of the victims as "having been fired" from the black Glock found at the crime scene. It also "identified" the fired cartridge cases police recovered to that same gun. This matching technology was the very basis of the litigation in *Abruquah*, a fact we made clear when we initially remanded that case in October 2020. *Abruquah v. State*, 471 Md. 249, 250 (2020) (remanding with instruction to the circuit court "to consider whether, in light of this Court's decision in *Rochkind v. Stevenson*, . . . the Circuit Court would reach a different conclusion concerning the admission of firearms and toolmark identification testimony").

King cannot argue that the report reveals no issues on its face, and, in the same breath, argue that the absence of the firearms examiner's bench notes prevented him from raising "the pretrial issue of admissibility and reliability" earlier than the eve of the trial in April 2022. The explicit findings of the expert report, along with our *Abruquah* decision from 2020 and the studies that call into question the reliability of firearms matching

17

technology, both of which the Defense admits to being aware of, provided King with notice that the reliability of firearms and toolmark identification was squarely at issue in this case. If King was indeed seeking to challenge the State's firearms expert testimony on reliability grounds, he could have brought this claim to the court's and opposing counsel's attention well before the first day of trial even absent the bench notes. Validating this oversight would be tantamount to embracing judicial inefficiency.

King's retroactivity argument fares no better. Even though King raised the *Abruquah* issue for the first time in his reply brief before the Appellate Court, he argues that our holding should apply to his case. *Abruquah*, 483 Md. at 698. In accordance with our case law, "new interpretations of constitutional provisions, statutes[,] or rules . . . appl[y] to the case before us and all other pending cases where the relevant question has been preserved for appellate review." *Hackney v. State*, 459 Md. 108, 119 (2018) (internal citations and quotation marks omitted). The Defense knew about the firearms examiner's findings at least nine months ahead of trial. The Defense also knew that under *Rochkind* a new standard of evidentiary admissibility had been announced and that "everything old is new again with respect to some scientific and technical evidentiary matters long considered settled." *Rochkind*, 471 Md. at 38 (internal quotation marks omitted). The Defense was also aware that we remanded the initial *Abruquah* case before us with instructions to the circuit court to consider whether it "would reach a different conclusion concerning the admission of firearms and toolmark identification testimony[.]" *Abruquah*, 471 Md. at 250. Moreover, as Petitioner points out, the studies that led to our holding in *Abruquah*, namely the 2008 report of the National Research Council of the

18

National Academies of Science, the 2009 report of the same institution, and the 2016 report of the President's Council of Advisors on Science and Technology ("PCAST"), were widely available years prior to Respondent's trial. *Abruquah*, 483 Md. at 662-66. Respondent was aware of the PCAST report, and he could have relied on it, along with the other studies, to mount a *Daubert* challenge. Despite ample notice, King failed to preserve his potential *Abruquah* claim. Therefore, even if we were to assume without deciding that our *Abruquah* decision was a new interpretation of a rule, we decline to apply it retroactively because the relevant question here has not been preserved for appellate review.

> 2.       *Respondent opposed a* Daubert *hearing and never filed a* Daubert *motion pursuant to Maryland Rule 4-252.*

Moreover, King failed to preserve his *Abruquah* claim in accordance with Rule 4-252. Maryland Rule 4-252 details the procedure by which parties file motions, such as a *Daubert* motion, in the circuit court. Most relevant to this case, Rule 4-252(d)(3)[2] and (e) provide:

> *(d)(3)  Any Other Motion.*  Any other Defense, objection, or request capable of determination before trial without trial of the general issue, shall be raised by motion filed at any time before trial.
> *(e)  Content.*  A motion filed pursuant to this Rule shall be in writing unless the court otherwise directs, shall state the grounds upon which it is made, and shall set forth the relief sought. . . . Every motion shall be accompanied by a statement of points and citation of authorities.

---

[2] When Respondent's trial was taking place, Rule 4-252(d) included the language that is currently listed under Rule 4-252(d)(3), but subsection 4-252(d)(3) did not exist. For ease of reference, we refer to Rule 4-252(d)(3) throughout this opinion.

19

This Court reviews de novo whether a litigant adhered to the requirements of Rule 4-252 under a given set of facts. *Cole*, 378 Md. at 56.

Here, the Defense never filed a *Daubert* motion pursuant to Rule 4-252(d)(3) and (e). On two occasions, the Defense expressed their intention to file a motion opposing the State's firearms expert testimony. Before the court made its ruling on the admissibility of the State's forensic firearms examiner, the Defense said that they "will file a request for a *Daubert* hearing at this point in time for [King]." Then, following the court's denial of the Defense's request to exclude said testimony, the Defense reiterated that they "will be filing today . . . a motion in limine to exclude firearms identification evidence as unreliable [under] *Rochkind* . . . to the as-applied issues, as well as to the general issues," adding that it planned to "provide courtesy copies to the Court." Yet, no motion was ever filed before trial, and no hearing challenging the reliability of firearms and toolmark identification occurred. To preserve his objection to the reliability of the State's firearms expert testimony, King was required, under Rule 4-252(d)(3) and (e), to file a timely motion in writing, accompanied by a statement of points and citation of authorities. Allowing King to move forward with a claim that he never formally filed in accordance with this requirement would contravene a mandatory rule that every litigant must otherwise strictly follow. *See Winder v. State*, 362 Md. 275, 322 (2001).

Nor did the circuit court grant the Defense leave under Rule 4-252(e) to challenge the reliability of the State's firearms expert testimony orally. Rule 4-252(e) affords the circuit court discretion to waive the writing requirement for motions submitted to the trial court. Rule 4-252(e) ("A motion filed pursuant to this Rule shall be in writing *unless the*

20

*court otherwise directs*[.]" (emphasis added)). In denying King's motion to exclude the State's firearms expert testimony, the court explicitly found that "the field is not at issue." "The issue [the] Defense says is as-applied." Having determined the basis of the objection to be an "as-applied" challenge, the court found that "[the] Defense is capable of impeaching the witness with regard to . . . failing to follow the standard operating procedures, and that can go to the weight of the evidence for the jury." The trial court's ruling was limited to the "as-applied" objection, meaning any implicit permission the court gave King to pursue his objections orally, as opposed to in a written motion, was also limited to the same objection. By not filing a timely written *Daubert* motion on the reliability of firearms toolmark and identification as a field, nor receiving leave from the trial court to pursue this objection orally, King failed to meet the requirements of Rule 4-252(d)(3) and (e) and thereby preserve his *Abruquah* claim.

Because the Defense never filed a motion pursuant to Rule 4-252, King's challenge to the reliability of the firearms methodology was never properly presented to the trial court. Confining appellate review to the objection actually litigated—the as-applied challenge—is what the purpose and strict framework of Rule 4-252(d) and (e) require. These provisions exist to facilitate the fair and efficient administration of justice by providing the court and the opposing party "with the time and information necessary to address the issues raised by the motion." *Smith v. State*, 481 Md. 368, 416 (2022) (Gould, J., dissenting). Indeed, as we have previously explained, "[t]he obvious and necessary purpose" of Rule 4-252(e) is "to alert both the court and the prosecutor to the precise nature of the complaint, in order that the prosecutor have a fair opportunity to defend against it

21

and that the court understand the issue before it." *Denicolis v. State*, 378 Md. 646, 660 (2003). This purpose applies with full force when a party is seeking to challenge the reliability of a complex field of evidentiary science, an inquiry that inherently requires adequate notice and preparation to litigate.

The record reflects that the Defense not only refrained from requesting a *Daubert* hearing, but also on several occasions affirmatively declined to pursue one. Because no such motion was ever made, King's reliability challenge was not preserved for appellate review. To maintain the predictable and orderly administration of justice that the rule is designed to safeguard, appellate review must be confined to the specific issues and motions that were actually presented to the trial court.

## B. Even if the Claim Were Merely Unpreserved, the Appellate Court Applied the Incorrect Standard of Review

King's unpreserved contention of error in admitting the firearms examiner's testimony was subject to plain error review. *State v. Thornton*, No. 46, Sept. Term, 2025, 2026 WL 1846743, at *6 (Md. June 26, 2026); Md. Rule 8-131(a). King therefore had to establish four conditions: (1) there was an error or defect that has not been intentionally relinquished or abandoned; (2) the legal error was clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which ordinarily means it affected the outcome of the proceedings; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* (citing *Beckwitt v. State*, 477 Md. 398, 464 (2022)). The Defense's conduct at trial amounted to an affirmative

22

waiver, a conclusion that alone defeats King's claim because he cannot satisfy the first prong of plain error.

But even if this Court were to treat the claim as merely unpreserved rather than intentionally waived, King could not satisfy other plain error prongs. King argues that the Appellate Court "did not need" to analyze the case for plain error and "could not have done so, since the error could not have been obvious to the trial court" before this Court decided *Abruquah*. (citing *State v. Rich*, 415 Md. 567, 578 (2010)). That argument is wrong for two reasons. One is that King does not have any path to appellate review other than plain error. If he cannot satisfy the four prongs of plain error review, that means he cannot prevail on his claim, not that he gets to pick another test. The second reason King's argument is wrong is that it fundamentally inverts the applicable framework. That the asserted error was not clear or obvious does not mean plain error review was unavailable; rather, it is the precise reason King's claim fails on the merits.

The requirement that an error be "clear or obvious, rather than subject to reasonable dispute" is the second prerequisite of plain-error review, *Beckwitt*, 477 Md. at 464, and King, quoting that very requirement, concedes he cannot meet it. A defendant who concedes that the asserted error was not clear or obvious has conceded that he cannot obtain plain-error relief. He has not shown that some more forgiving standard governs in its place. An unpreserved claim is reviewed for plain error, and where the error was not clear or obvious, the claim fails on that review. It does not morph into review for abuse of discretion. To the extent King contends the Appellate Court could have reached the merits

23

without applying plain error review at all, that contention depends on the claims having been preserved, which for the reasons stated in Part A it was not.

### C. The Admission of the Testimony Was Not Plain Error

Even applying the plain error standard that should have governed, King's claim fails. The admission of the firearms examiner's unqualified opinion was not clear or obvious error, which is dispositive under *Beckwitt*, 477 Md. at 464. At the time of King's trial in April and May 2022, no Maryland appellate court had ruled on the admissibility of conclusive firearms identification testimony under the *Daubert-Rochkind* standard. *Rochkind* had replaced *Frye-Reed* two years earlier, cautioning that "everything old is new again[.]" 471 Md. at 38. And in October 2020, a year and a half before King's trial, this Court vacated and remanded Abruquah's case with an instruction to the circuit court "to consider whether, in light of this Court's decision in *Rochkind v. Stevenson*, . . . the Circuit Court would reach a different conclusion concerning the admission of firearms and toolmark identification testimony[.]" *Abruquah*, 471 Md. at 250. The very question at issue here was being actively litigated and publicly debated. The law was unsettled, not settled. An error that occurs in an unsettled area of law, where reasonable minds can disagree, cannot be characterized as clear or obvious. *Beckwitt*, 477 Md. at 464.

Nor was the alleged error clear or obvious at the time of appeal, as Respondent concedes in his briefing—"the error could not have been obvious to the trial court[] before the *Abruquah* opinion had been issued." Moreover, as we explain at greater length in our companion case, *Thornton*, 2026 WL 1846743, at *8-9, *Abruquah* was a case-specific *Daubert* determination, not a per se prohibition on unqualified firearms identification

24

testimony. This Court expressly limited its holding to "the evidence presented at the hearings" in that case, *Abruquah*, 483 Md. at 698, declined to consider additional studies that were not in the record, *id.* at 656 n.6, and stated that it did "not preclude the possibility that the [analytical] gap may be closed in the future," *id.* at 694. Federal and state courts applying *Daubert* continue to admit unqualified firearms identification testimony. *See Thornton*, 2026 WL 1846743, at *9 (collecting cases). An evidentiary ruling subject to such robust, reasonable dispute across multiple jurisdictions is, by definition, neither clear nor obvious.[3] *Beckwitt*, 477 Md. at 464. Because the asserted error lacked the requisite clarity at both the time of trial and the time of appeal, King cannot satisfy the second *Beckwitt* prerequisite, rendering him entirely ineligible for plain error relief.

## D. There Was No *Daubert* Ruling to Review

The trial court's ruling could not be reviewed for abuse of discretion because it was subject to plain error review. That ruling also could not be reviewed for abuse of discretion because there was no exercise of discretion to review. The trial court here was never asked to make a *Daubert* ruling on the reliability of the AFTE methodology. It was asked to resolve a discovery dispute about bench notes, and it did so. When the court inquired into the basis for the Defense's objection, Defense counsel confirmed that the issue was "not

---

[3] An error subject to dispute across jurisdictions could be clear and obvious if the issue was settled here. In other words, if we have finally resolved an issue one way, but Virginia and Massachusetts have finally resolved it another way, a Maryland court applying the Virginia and Massachusetts resolution would be making a clear and obvious error. Here, the fact that it was subject to reasonable dispute in other jurisdictions is relevant only because the issue was not settled in Maryland.

with the science" but with whether the examiner had followed proper procedures. The court accepted that representation and found that "the field is not at issue." There was, in short, no *Daubert* ruling on the reliability of the methodology to review, because no party ever asked the trial court to make one.

The *Abruquah* record was developed through a four-day hearing with extensive expert testimony and multiple scientific studies. Nothing comparable exists here. As we explained in *Thornton*, *Daubert* determinations are inherently record-dependent, and the absence of any record bearing on the reliability of the AFTE methodology leaves an appellate court without a factual foundation to conduct the analysis *Daubert* requires. *See Thornton*, 2026 WL 1846743, at *10 (discussing *Cortés-Irizarry v. Corporación Insular De Seguros*, 111 F.3d 184, 189 (1st Cir. 1997)). A reviewing court cannot superimpose a *Daubert* ruling on a record that contains none.

## V.

## CONCLUSION

Respondent waived any challenge to the reliability of the firearms identification methodology by disclaiming on the record any objection to "the science" and confining its objection to an as-applied dispute about the examiner's compliance with standard operating procedures. Respondent compounded that waiver by failing to file the written *Daubert* motion that Maryland Rule 4-252 requires and by opposing a *Daubert* hearing rather than requesting one.

Even if this claim were treated as merely unpreserved rather than intentionally waived, Respondent's contentions were subject to plain error and cannot meet that

26

standard. Respondent's claim failed on the second prong of the plain error test, as the admission of the firearms examiner's unqualified opinion was not a clear or obvious error at the time of trial or appeal, because *Abruquah* represents a case-specific *Daubert* determination rather than a per se exclusion of toolmark evidence. In addition, there was no record of a *Daubert* hearing that was ripe for review on appeal.

For the reasons stated above, we reverse the judgment of the Appellate Court. We remand the case to the Appellate Court for that court to address the claims of error raised by Respondent that the Appellate Court did not reach in its original opinion.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED. CASE REMANDED TO THE APPELLATE COURT OF MARYLAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**